**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| KENNITH L. BELL, | : | |
| | : | |
| Debtor. | : | Bky. No. 09-15352 ELF |
| _____ | : | |
| NWI ORTHODONTICS, P.C., <u>et. al.</u>, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Adv. No. 09-339 ELF |
| | : | |
| | : | |
| KENNITH L. BELL, | : | |
| | : | |
| Defendant. | : | |

# O P I N I O N

## I.  INTRODUCTION

In this adversary proceeding, Plaintiffs NWI Orthodontics, Inc. ("NWI") and its

shareholders, Drs. Kenneth Hyde ("Hyde"), Michael Koufos ("Koufos"), and Charles Hurst

("Hurst"), seek a determination that their claims against Debtor Kennith L. Bell ("Bell or the

Debtor") are nondischargeable under 11 U.S.C. §523(a).

Bell was employed by NWI as its Practice Administrator and Executive Director from

1996 to 2006.  After discovering various financial irregularities and commissioning a forensic

investigation of its corporate books and records, NWI terminated Bell's employment.

In this adversary proceeding, the Plaintiffs assert that the Debtor misappropriated NWI's

funds during his tenure at their orthodontic practice.  In addition to requesting a determination of

nondischargeability, they further request that this court liquidate and enter judgment in their

favor in the amount of $1,475,505.00. Finally, they request that this court award them treble damages pursuant to Indiana law.

As explained below, after trial of the matter, I conclude that:

(1) NWI is entitled to a determination that its claim against the Debtor is nondischargeable under 11 U.S.C. §523(a)(4) in the amount of $1,230,956.43;

(2) this court should not enter a money judgment in favor of NWI and, consequently, should not determine whether the nondischargeable debt should be trebled, leaving that determination to the Indiana state court;

(3) the Debtor is entitled to judgment against Plaintiffs Hyde, Koufos and Hurst on all counts in the Complaint.[1]

## II. PROCEDURAL HISTORY

### A. Pre-Bankruptcy Litigation

On July 31, 2006, following the termination of his employment, the Debtor sued NWI in the Superior Court of Indiana at No. 64D05-0607-PL6641 ("the State Court Action"), asserting various claims for monetary damages arising from his employment and stock ownership. NWI filed a counterclaim for, inter alia, breach of contract, breach of fiduciary duty, fraud and conversion.

In 2008, NWI commenced a separate lawsuit against the Debtor in the U.S. District Court

---

[1]        For a debt to be nondischargeable pursuant to 11 U.S.C. §523(a), the plaintiff must establish two (2) elements: (a) that a valid debt exists, and (b) the debt must satisfy all the requirements under one of the subsections of §523(a). See, e.g., In re August, 448 B.R. 331, 346-47 (Bankr. E.D. Pa. 2010). Plaintiffs Hyde, Koufos, and Hurst presented no evidence that the Debtor owes a debt to them in their individual capacity. The evidence established that the Debtor's misconduct and liability ran to the corporate entity only, not to its individual shareholders.

for the Northern District of Indiana, <u>NWI Orthodontics v. Bell</u>, No. 2:08-cv-332 ("the District

Court Action").  (<u>See</u> Bky. No. 09-15352, Doc. #44-1).  NWI brought the District Court Action

in its capacity as sponsor and fiduciary of its 401(k) plan ("the 401(k) Plan").  NWI requested:

(1) a declaratory judgment that the Debtor caused NWI to pay approximately $19,000.00 in

excess employer contributions to the corporation's 401(k) Plan for his own benefit; (2) the

authority to set off the excess contributions against the Debtor's interest in the 401(k) Plan

pursuant to 29 U.S.C. §1109; and (3) costs and attorney's fees.


### B.  The Debtor's Bankruptcy Filing and the Adversary Proceeding

On July 22, 2009, the Debtor filed a voluntary chapter 7 bankruptcy case, which stayed both

the state and federal Indiana lawsuits described above.

On October 30, 2009, NWI initiated this adversary proceeding ("the Adversary

Proceeding") against the Debtor, requesting a determination that its claims against the Debtor are

nondischargeable pursuant to 11 U.S.C. §§523(a)(4) and (a)(6).  NWI alleged that while

employed at NWI the Debtor:

> (1)  embezzled and converted funds;
>
> (2)  awarded himself excessive compensation, shareholder distributions and expense
>      reimbursements;
>
> (3)  failed to repay a loan from NWI; and
>
> (4)  caused NWI to make excessive contributions on the Debtor's behalf  to the
>      401(k) Plan.

On June 18, 2010, at the suggestion of the parties, the court placed the Adversary

Proceeding in suspense, pending the outcome of the State Court Action.  (<u>See</u> Adv. No. 09-0339,

Doc. #'s 19, 21).  On May 16, 2012, the court "reactivated" the Adversary Proceeding and

scheduled trial to commence on September 27, 2012.  (Adv. No. 09-0339, Doc. #34).[2]

Trial was held September 27, 2012 and September 28, 2012.  Post-trial briefing was

completed February 21, 2013.

## III.  FINDINGS  OF  FACT

Upon consideration of the pleadings, stipulated facts, documentary evidence, testimony

presented at trial, and the post-trial submissions, I make the following findings of fact.  In

making these findings, I have resolved the conflicting testimony of the witnesses by considering

their credibility and demeanor, the plausibility of their testimony, the existence of corroborating

circumstantial, testimonial or documentary evidence and the totality of the evidentiary record.

Further, with respect to certain facts, I have made the findings based on a very meager record,

compelling me at times to resort to use of common sense and life experience to draw necessary

factual inferences in order to fill in gaps and formulate a coherent factual narrative.[3]

---

[2]      The Plaintiffs, in particular, expressed cautious optimism that, following the litigation of their claims against (and expected recoveries from) third parties, they might decide, for practical reasons, to drop their claims against the Debtor.  The Debtor, likely hoping for that outcome, agreed to the deferral of the Adversary Proceeding.  Subsequently, the Plaintiffs advised this court that they intended to go forward in the Adversary Proceeding.

[3]      With respect to the most significant factual findings, I have analyzed the evidence and explained the inferences that I have drawn in either footnotes to the factual findings or in the Discussion that follows in Part V. of the Opinion.

### The Orthodontic Practice

1.  Orthodontics, Inc. ("Ortho, Inc."), an Indiana professional corporation, provided orthodontic treatment to its patients in Lake and Porter counties, Indiana from 1968 to 2003.

2.  After several senior shareholders retired in 2000, Ortho, Inc. was comprised of three (3) shareholders: Drs. Kenneth Hyde ("Hyde"), Michael Koufos ("Koufos"), and Charles Hurst ("Hurst") (collectively, "the Doctors").[4]

3.  Ortho, Inc. was taxed under subchapter C of the Internal Revenue Code ("the IRC").  (1 N.T. 1:13:10).[5]

4.  In 2003, NWI Orthodontics, Inc. ("NWI") was formed to purchase the assets and assume the liabilities held by Ortho, Inc.  (Joint Pretrial Statement ¶B,4(l)).

### Bell's Employment and Duties

5.  Bell began his employment with the orthodontic practice as the "Practice Administrator" in October 1996.  (1 N.T. 9:51:15; see also Ex. NWI-A).

6.  In 1997, his title was changed to "Executive Director."  (See Ex. NWI-B).

7.  As Executive Director, Bell was responsible for the management of the orthodontic practice's financial affairs, including maintaining and overseeing payroll and operating

---

[4]    During 2000-2001, other orthodontists joined the practice but had not attained full shareholder/partner status.

[5]    In this Opinion, I will cite to the notes of testimony by referring to the two (2) days of trial, rather than the specific trial date.  Thus, I will cite to the September 27, 2012 notes of testimony as "1 N.T." and the September 28, 2012 notes of testimony as "2 N.T."

accounts.

8.    Bell was required to establish, manage and maintain employee medical benefits and retirement savings plans for all of the practice's employees.  (See NWI-A).

9.    Bell also established lines of credit that were used to fund capital improvements and expenditures.  (1 N.T. 1:15:25).

10.   Bell was granted check-signing authority for Ortho, Inc. in May 2002.  (2 N.T. 1:42:42).

11.   A corporate credit card was established for Bell to enable him to pay for business expenses of the orthodontic practice.  (2 N.T. 1:39:20).


### Bell's Compensation at Ortho, Inc.

12.   Under Bell's initial employment agreement, Ortho, Inc. compensated Bell at an annual rate of $80,000.00.  (Ex. NWI-A).  The agreement also provided certain fringe benefits, including medical insurance, vacation, retirement contributions, and business mileage reimbursement.  (Id.).

13.   In 1999, Ortho, Inc. and Bell negotiated a new employment agreement ("the Employment Agreement"), which modified the structure of Bell's compensation.  (See Ex. NWI-F).

14.   The Employment Agreement provided for Bell to be compensated at a rate of $80,000.00 per year ("the Base Salary"), plus one-half of the difference between a full partner's total compensation and $80,000.00 ("the Bonus").  Id.[6]

---

[6]    The Employment Agreement states:

> [A]t the start of each fiscal year beginning in 1999 [Bell's] compensation will include the **base salary of $80,000 and the difference between the base salary**
>
> (continued...)

15.    The full partner's "total compensation" portion of the Bonus computation included the

Doctors' salary, bonuses and corporate dividends/distributions.  It did not include pension

contributions, travel reimbursement, children's salaries, or petty cash disbursements.[7]

_____

[6](...continued)

**and one half of a full partner['[]s total compensation for that year**. (i.e. Full partner in 1998 receives $260,000, half being $130,000 [Bell] to receive $80,000 plus $50,000).

(Ex. NWI-F) (emphasis added).

Literally, the Employment Agreement calculates the Debtor's Bonus based on "a full partners [sic] total compensation."  This creates an ambiguity in that it does not specify which full partner's salary should be used for the calculation (and the partners were not compensated equally).  Both NWI's expert and the Debtor calculated the Debtor's rightful compensation by using an average of the Doctors' compensation for each year.  I, too, will utilize the parties' common methodology.

[7]    The proper computation of the Debtor's compensation package under the Employment Agreement was vigorously contested at trial.

A significant portion of the debt that NWI claims is nondischargeable are the Bonus payments Bell drew.  The parties disagreed whether the Bonus was based solely upon the Doctors' annual salary or whether it was based upon **all** forms of compensation the Doctors' received throughout the year.

NWI's expert used the Doctors' payroll (i.e., salary and bonus) as the basis for calculating the Debtor's Bonus.  (See Ex. NWI-T, NWI-BB).  Dr. Hyde supported this approach in his testimony.  (See 1 N.T. 10:05:41).  The Debtor disputed these contentions and testified that his Bonus compensation took into account all of the Doctors' annual compensation, including inter alia, children's payroll, petty cash, mileage reimbursement, employer pension contributions, and corporate credit card usage.  (2 N.T. 2:02:15; see also Ex. D-1).

I find both positions overstated.  Based largely on the plain language of the Employment Agreement (referring to the Debtor's "salary" as being based on a percentage of a partner's "total compensation"), as well as the inferences that I draw from the circumstances in which the parties entered into the agreement, I reject NWI's contention that the Bonus was to be determined by reference to a full partner's salary, bonus and nothing else.  I conclude that the Bonus was also to be based on any compensation the "full partner" might receive in the form of salary, bonus **and corporate dividends**.  At the same time, I am unpersuaded by the Debtor's contention that the calculation went further to include items that are not truly compensation to the Doctors, such as reimbursements, payments to insider third parties or fringe benefits such as pension contributions.

16.     Under the Employment Agreement, Bell was not authorized to receive more than his Base

Salary and Bonus.  (1 N.T. 4:05:22).


### The 1998 Note

17.     After he began his employment, Bell received a $100,000.00 loan from Ortho, Inc. to use as

a down payment on a home.  (2 N.T. 1:43:30).

18.     In exchange for the loan, Bell executed a promissory note ("the Note"), repayment of which

was to be made in five (5) payments of $20,000.00 each year until the Note was paid in full.

(1 N.T. 11:23:00).

19.     In October 1998, the terms of the Note were amended.  The principal was reduced to

$80,000.00 and Bell was required to repay the Note with 9% interest.[8]  (See Ex. NWI-Q).

20.     Bell made no payments on the Note to NWI after its formation.  (2 N.T. 3:06:45; Joint

Pretrial Statement ¶4,B(f)).

21.     At the time of trial, the Note remained outstanding in the amount of $186,733.00, which

included accrued interest.  (Ex. NWI-BB).

---

[8]        The parties disagreed as to how repayment was to be made on the Note.  Dr. Hyde
testified his understanding was that Bell would satisfy the Note by taking an annual reduction of
$20,000.00 against his Base Salary.  (1 N.T. 11:22:45).  Bell contends that he was to receive a
$20,000.00 increase in Base Salary, then offset by a $20,000.00 repayment each year until the Note was
paid back (functionally resulting in loan forgiveness of $20,000.00 each year).  (2 N.T. 4:04:00).

        Because the method of repayment of the Note is not material to a determination of the
dischargeability of the debt, I make no findings on this issue.

## NWI's Formation and the Shareholder Agreement

22.   Ortho, Inc. and NWI employed Richard Foley ("Foley") as its accountant from August 2000 through December 2005.  (Joint Pretrial Statement ¶B,4(k)).

23.   In 2002, Foley proposed a change in corporate form[9] that would allow Ortho, Inc. to take advantage of favorable tax benefits by converting from a subchapter C corporation to a subchapter S corporation.  (2 N.T. 3:24:05).

24.   In May 2003, Ortho, Inc. and NWI entered into a "Sale and Purchase Agreement," whereby NWI purchased the assets and assumed all the liabilities of Ortho, Inc.  (Ex. NWI-X).

25.   NWI subsequently elected to be taxed under subchapter S of the IRC.  (Joint Pretrial Statement ¶B,4(l)).

26.   At the time of NWI's acquisition of Ortho, Inc., the Doctors and Bell entered into a "Buy-Sell Agreement," which was, in effect, a shareholders' agreement ("the Shareholder Agreement").  (Ex. NWI-W).[10]

27.   The Shareholder Agreement was drafted by James Jorgensen ("Jorgensen"), corporate counsel for Ortho, Inc. and NWI.  (See Ex. D-3).

28.   None of the individual shareholders of NWI consulted with independent outside legal counsel regarding the change in corporate form or the Shareholder Agreement.  (1 N.T.

---

[9]      Bell acknowledged that Foley came up with the idea of the conversion, but that he (Bell) took credit for it.  (2 N.T. 3:26:00).

[10]      Dr. Koufos testified that the February 18, 2003 date on the Shareholder Agreement is inaccurate.  His recollection was that he and the other signatories executed the Shareholder Agreement in May 2003 or later.  (1 N.T. 1:23:00).

3:17:52).

29.   Under the terms of the Shareholder Agreement, Hyde, Koufos, Hurst, and Bell became

equal shareholders and each owned 100 shares in NWI.  (See NWI-W).

30.   The Shareholder Agreement included, inter alia:

  a.  a restriction on the shareholders' right to sell, assign or transfer his or her
      shares and an option to NWI and the other shareholders to purchase the shares
      prior to transfer; (Ex. NWI-W, ¶¶3-5);

  b.  a schedule based upon years of service for the corporation to determine a
      departing shareholder's payout upon retirement, withdrawal, death, or
      disability;  (Id. ¶¶6-9).

31.   Paragraph 17 of the Shareholder Agreement, entitled "Limitation of Rights," provided:

  Upon Mr. Bell's withdrawal as an employee of the corporation, whether by
  termination of employment, retirement, death, disability or otherwise, Mr. Bell
  shall immediately surrender his Stock and **he shall receive nothing for it.**

(Id. ¶17) (emphasis added).

32.   The Shareholder Agreement lacked any provisions that addressed the shareholders' right to

receive dividends in the new corporation.

33.   The Shareholder Agreement did not contain a contract integration clause or a choice of law

provision.

34.   With regard to Bell, the Shareholder Agreement was to provide him with a limited stake in

NWI, solely for the purpose of allowing him to share in the favorable tax benefits of

electing subchapter S status, but with no other incidents of ownership.  (1 N.T. 11:42:45,

1:24:00).

35.   When he entered into the Shareholder Agreement, Bell understood that its purpose was to

provide him with shareholder status solely for the favorable tax benefits.  (Id.).

## Salary and Bonus at NWI

36. Bell's Employment Agreement remained in effect after NWI was formed and his Base

   Salary and Bonus continued to be calculated based upon the Doctors' salary, bonuses and

   dividends. <u>See</u> Findings of Fact Nos. 14-16.

37. During his employment at both entities – Ortho, Inc. and NWI – Bell received a total of

   $118,204.06 in excess Base Salary. (Ex. NWI-T, NWI-BB).[11]

38. Bell also overpaid himself a total of $393,039.37 in Bonus compensation during his

   employment with both entities. (<u>Id.</u>).[12]


## Corporate Dividends

39. As Executive Director of NWI, Bell exercised the authority to determine when dividends

   were to be paid to the shareholders and in what amount. (2 N.T. 9:59:00).

40. Bell authorized NWI to pay himself corporate dividend distributions equal to the Doctors'

   dividends. (Joint Pretrial Statement ¶B,4(o)).[13]

41. Hyde, Koufos, and Hurst were unaware that Bell was receiving dividends from NWI. (1

---

[11]    Bell conceded only that he overpaid himself approximately $24,000.00. (2 N.T. 2:03:00; <u>see</u> Ex. D-1). However, he was unable to controvert the conclusion in NWI's expert report that he received $118,204.06 in excess Base Salary not authorized under the Employment Agreement. (2 N.T. 2:18:20). Finding of Fact No. 37 is significant and is discussed further in Part V.A.1. <u>infra</u>.

[12]    This finding is discussed further in Part V.A.2. <u>infra</u>.

[13]    Whether these payments were authorized by the Shareholder Agreement was disputed at trial. I will discuss this issue further in Part V.A.3., below.

N.T. 11:43:45; 1:20:20; 4:05:42).[14]

42. From 2003 until 2005, Bell received $162,342.00 in corporate dividends.  (2 N.T. 9:47:55; Ex. NWI-BB).

## Corporate Credit Card Usage

43. NWI's corporate policy allowed the shareholders to use the corporate credit card for personal expenses.  The shareholders were required to reimburse NWI for the personal expenses.[15]  (1 N.T. 11:03:28).

44. Bell tracked some, but not all, of his personal use of the corporate credit card by placing a notation in NWI's accounting system distinguishing personal expenses from business expenses.  (2 N.T. 9:53:00, 3:03:30).

45. Hyde and Koufos used their corporate credit cards for personal use and did not always reimburse NWI for the expense.  (1 N.T. 11:02:20, 3:23:30).

46. From March 2002 through June 2006, Bell charged $236,541.00 to the corporate credit card

---

[14]     Hyde testified that he was unaware that Bell was receiving salary and dividends in 2003, while he (Hyde) and the other Doctors were receiving dividends only.  (1 N.T 1:43:45).  Further, Hyde stated he was under the impression that Bell would be receiving only a tax deduction, not equal distributions.  (1 N.T. 11:42:02).

[15]     Despite Dr. Hurst's testimony to the contrary, (1 N.T. 4:03:00), I find that Bell was authorized to charge personal expenses on the credit card.  I credit the Debtor's testimony that personal use of the credit card was permitted, provided that such use was reconciled at the end of the year by "evening out."  (2 N.T. 3:03:44).  Presumably this would entail an adjustment of an individual shareholder's bonus or dividends in proportion to the amount of personal use charged to the corporate credit card account.  However, the reconciliation never occurred.

for personal and other unsubstantiated corporate credit card charges.  (See Ex. NWI-BB).[16]

_____

[16]      NWI asserted that the unauthorized credit card charges totaled $268,813.00, broken down as follows:

| | | |
|---:|---|---|
| $ 4,630.00 | – | food |
| 40,973.00 | – | personal expenses |
| 40,340.00 | – | meals/entertainment |
| 182,870.00 | – | other charges |
| $268,813.00 | | |

(See Ex. NWI-BB).

        After evaluating the expert report and the related testimony, I am convinced that NWI easily satisfied its burden of proving that substantial portions of Bell's credit card charges were unauthorized and constituted a misappropriation of corporate assets.

        Bell put forward a kind of "global" defense theory, in which he posited that he did nothing differently than the Doctors.  I consider this to be an implied argument that his use of the corporate card to pay for personal expenses was authorized by NWI's officers as a form of additional ("under-the-table") compensation.  Putting aside whether the Doctors had the authority to bind NWI to such an arrangement, the record does not support such a finding.  Bell offered no evidence, other than his bald assertion, that he used the credit card in the same manner as the other shareholders.  After considering the competing evidence presented by both sides, I am satisfied that NWI has sustained its burden of proof on this issue.

        However, I also find that some portion of the credit card charges were legitimate business expenses.  In particular, I credit Bell's testimony that he used the credit card to pay for meal expenses regularly incurred in connection with office meetings in the multiple locations in which the orthodontic practice operated.  Insofar as neither party provided a methodology for me to distinguish these legitimate expenses with specificity, I find it reasonable to treat only twenty percent (20%), or $8,068, of the "meal/entertainment" line item as unauthorized.  This results in a reduction of the total of unauthorized charges by $32,272.00, from $268,813.00 to $236,541.00.  See Maso v. Morales, 2012 WL 5935417, at *4 (V.I., Nov. 21, 2012) (quoting Holmes v. Freeman, 185 A.2d 88, 921 (Conn. Super. Ct. 1962) ("Where from the nature of the case the amount of damages cannot be proven with exactitude, all that can be required is that the evidence, with such certainty as the nature of the case may permit, lay a foundation which will enable the trier to make a fair and reasonable estimate")); see also R.L. Coolsaet Constr. Co. v. Local 150, Inter. Union of Oper. Engineers, 177 F.3d 648, 660 (7th Cir. 1999) (permitting award of damages based on "a just and reasonable approximation"); Foam & Plastics Div., Tenneco Chemicals, Inc. v. Gen. Drivers & Helpers Local Union, 520 F.2d 945, 950 (3d Cir. 1975) (permitting award of damages where there is a basis in the evidence for a reasonable computation of the damage suffered).

-13-

**Mileage Expenses**

47.    In his capacity as Executive Director, Bell made the decision whether NWI's shareholders

would receive travel reimbursement.

48.    Bell frequently traveled between NWI's six (6) offices and tracked his mileage on a

spreadsheet that he submitted for reimbursement.  (2 N.T. 4:02:10).

49.    In May 2003, Bell declared no further travel reimbursements would be made until business

improved.  (Ex. NWI-N).

50.    After May 2003, Bell continued to reimburse himself travel expenses until 2006.  He

received $31,244.00 for mileage reimbursements.  (See Ex. NWI-BB).

51.    No other shareholders received mileage reimbursements from NWI after May 2003.  (Id.).


**Petty Cash Disbursements**

52.    NWI had a petty cash account of between $150.00 to $200.00 at each of their six (6) offices.

53.    The petty cash accounts were replenished as necessary by drawing a check on the corporate

operating account for the exact amount to replenish the petty cash account to its starting

amount.  (1 N.T. 4:24:40).

54.    Beginning in September 2001 and continuing until August 2003, Bell periodically wrote

checks made out to petty cash, typically for $1,500.00 each and totaling $56,375.00 for that

time period.  (See Ex. NWI-M).

55.    The petty checks frequently were cashed by an office employee and the cash was delivered

to Bell.  (1 N.T. 10:38:35, 4:40:15).

56.    Bell was unable to account for the petty cash disbursements.

57. The $56,375.00 in petty cash disbursements to Bell were unauthorized and unsupported by

   any valid business purpose.[17]  (1 N.T. 10:36:00 – 10:43:23).

## Other Payments

58. Based on the excess compensation that Bell received, Ortho, Inc. and NWI made excess

   contributions to Bell's retirement account in the amount of $35,239.00.  (Ex. NWI-G, NWI-

   BB).

59. In 2005, NWI was notified that the IRS would conduct a focused audit of its conversion to a

   subchapter S corporation.  (1 N.T. 1:32:37).

60. As a result of the audit, NWI's shareholders were liable for additional taxes.  Individually,

   Bell was assessed an additional tax liability of $35,228.00.  (Ex. NWI-BB).

61. Bell satisfied his individual tax obligation using corporate funds and did not reimburse NWI

   for the payment to the IRS on his behalf.  (2 N.T. 2:07:20; Joint Pretrial Statement ¶B,4(q)).

---

[17]     This was a heavily contested issue at trial.  The Debtor did not dispute that he was in charge of petty cash replenishment for NWI's offices and frequently cashed checks in increments of $1,500.00.  He testified, however, that he did not retain the petty cash disbursements.  Rather, he claimed that he distributed the money to the Doctors.  (2 N.T. 1:58:45).  Bell further testified that he relied on the professional advice of Foley regarding the disbursement of petty cash to the Doctors.  (2 N.T. 1:58:10).

     Hyde, Koufos, and Hurst flatly denied receiving petty cash disbursements.  (1 N.T. 10:36:10, 3:29:55, 4:04:55; 2 N.T. 4:33:06).  The Doctors assert that Bell signed and authorized the checks and converted the cash for his own use to the detriment of the corporation.

     After consideration of the totality of the circumstances and Bell's overall conduct, I do not credit Bell's testimony that he cashed the petty cash checks and divided the money among the Doctors.  If, as the competing testimony suggests, all of the "under the table" cash disbursements went either entirely to Bell or entirely to the Doctors, I find it more likely than not that the monies were taken surreptitiously by Bell.  By a preponderance of the evidence, I find the Doctors' testimony more credible than Bell's.

62. Between March 2002 and February 2003, Bell authorized and issued corporate checks to himself, (some marked "void," but which nevertheless cleared the bank and were paid), in the amount of $78,455.00.  (See Ex. NWI-BB).

63. In 2006, Bell received $19,289.00 in personal advances from NWI, that were never repaid. (Ex. NWI-BB).[18]

### Financial Condition of Ortho, Inc. and NWI During Bell's Tenure

64. In 1996, when Bell was entrusted with the financial management of the corporation, Ortho, Inc. had no outstanding debt.  (Ex. NWI-BB).

65. From 1999 to 2006, the corporate income of Ortho, Inc. and NWI remained relatively stable with no substantial increases or decreases in revenue.  (See id.).

66. Beginning in February 2003, Bell began reporting to the Doctors that revenues had decreased from previous years.[19]  (Ex. NWI-N).

---

[18]    NWI's expert suggested that asserted that Bell is liable for three (3) other debts: (1) the $18,588.00 payment that Ortho, Inc. made to Crowe Chizek, for the executive search it performed which resulted in Ortho, Inc. hiring Bell as its practice administrator; (2) a $5,000.00 corporate sponsorship payment from Ortho, Inc. to Innovative Healthcare Designs, a company headed by Bell; and (3) $1,954.00 in petty cash payments to Bell's son, who worked for Ortho, Inc.  NWI appears to have abandoned these claims because they are not discussed in NWI's post-trial brief and are not listed among the damages claim in its proposed findings of fact and conclusions of law.

[19]    In a February 23, 2003 e-mail addressed to the Doctors, Bell stated:

> January revenue is down from the previous year. . . .  Our current debt is at $1.4 million dollars on $4.2 million A/R (good money) and less than $100K in bad money.  When I started in 1996 we w[]ere $1.7 million in debt; less than $3 million in A/R and over $1 million in bad money. . .

(Ex. NWI-N).

(continued...)

67.    In June 2003, Bell informed the other shareholders that NWI was experiencing a liquidity

crisis and had to borrow funds to meet current monthly expenses.[20]  (Id.).

68.    To address the liquidity crisis, Bell suspended payment of salary to the Doctors in August

and September 2003.[21]  (Ex. NWI-N at NWIMK01844, NWI-BB; 2 N.T. 2:38:30).

69.    By August 14, 2003, Bell's advised the Doctors that NWI's financial projections had not

improved and proposed several more cost-saving measures:[22]

---

[19](...continued)
Bell's statements regarding 1996 were an outright misrepresentation.  The expert report
demonstrates that Ortho, Inc. had no outstanding debt in before Bell took over management of the
corporation.  (See Ex. NWI-BB).


[20]    In his June 6, 2003 e-mail, Bell advised the Doctors, "we had to borrow $75,000 today to
pay our bills. . . . we may not be paid next week due to cash flow shortages."  (Ex. NWI-N).


[21]    On July 21, 2003, Bell again reported: "we are financially doing terrible [sic]. . . . we
cannot continue on in this manner. . . . There are only so many tricks I can continue to pull out of my hat.
By switching from a C to an S we were supposed to reap the rewards of big tax savings, however, you
need to have income to do this."  (Ex. NWI-N).

Bell proposed as a short-term remedy, that he would hold off on paying Doctors' salaries
for August and September 2003, defer paying retiring doctors' buyouts, discontinue capital projects, and
suspend the issuance of mileage checks.  (Id.)


[22]    At 3:00 a.m. on the morning of August 14, 2003, Bell sent an e-mail message to the
Doctors regarding the dire financial state of NWI and outlined possible measures that he felt might be
necessary to reverse the downward trend.  Bell lamented:

It is 3:00 in the am and I am lying awake pondering the future of OI. . . . As everyone is
well aware we have had dismal cash flow this year. . . . I have not seen any promise of
improvement to change this . . . We have gotten fat dumb and happy, we have had banner
years in the past, certainly since I have been here. . . . I have no more tricks up my sleeve.
It comes down to basic economics, "cash in" vs. "cash out" and we are having a tough
time with "cash in" to pay for our current level of comfort.  They say misery loves

(continued...)

-17-

    a.    Cutting all Doctors' salaries to $100,000.00 per year indefinitely;[23]

    b.    Eliminating staff benefits, in particular health insurance;

    c.    Trimming personnel by laying off as many five (5) staff members;

    d.    Eliminating all Doctors' "perks" indefinitely, including, distribution checks, food reimbursements, dues, subscriptions, and use of the corporate credit card;

    e.    Not funding the Doctors' pension plan contributions;

    f.    Delaying any further capital improvements.

(See Ex. NWI-N at NWIMK01837).

70.    Later that same day, August 14, 2003, Bell caused NWI to take an advance on one (1) of its lines of credit and wrote a check to himself in the amount of $65,000.00.  (1 N.T. 2:25:30; 2 N.T. 10:03:58, 2:54:42; see also Ex. NWI-U).[24]

71.    In the last half of 2003, the Doctors periodically received shareholder dividend distributions

---

[22](...continued)
    company, well I thought I should share with all of you, my sleepless night. . . .

(Ex. NWI-N at NWIMK01837).


[23]    Bell's August 14, 2003 e-mail reasserted that NWI would not pay the Doctors' salary for August and September 2003 citing the continued decline of NWI's financial conditions.  (See id.).


[24]    At trial, Bell acknowledged that he received the $65,000.00 check and that it was deposited into his personal bank account but could not recall why the transaction took place nor offer a valid business purpose for the payment of the check on the heels of his August 14th communication to the Doctors.  (2 N.T. 2:55:00).

from NWI in lieu of salary.[25]  (See Ex. NWI-T).

72.   By 2003, corporate records demonstrated that NWI had in excess of $1,600,000.00 in

outstanding debt.  That debt increased to over $1,800,000.00 in 2006.  (See Ex. NWI-BB).

73.   Bell utilized the corporation's numerous lines of credit to subsidize uncontrolled spending

and misrepresented the financial condition of the Ortho, Inc. and NWI to the Doctors.  (See

id.).

74.   Some of the money drawn on the lines of credit was used to fund capital improvements for

the corporation and the balance was used to subsidize NWI's general business operations.

(2 N.T. 4:10:45).

75.   Bell was unable to offer a business justification for the ongoing use of NWI's credit

facilities to support its ordinary course operations.[26]


**Events Leading to Bell's Termination**

76.   In June 2006, after members of NWI's staff voiced concerns regarding Bell's business

practices, Dr. Koufos initiated a forensic audit of NWI's corporate accounts.  (1 N.T.

---

[25]      Later in August 2003, Bell informed the Doctors that they would be paid when it was
economically feasible:

> I will, when I can, start to pay each of you on a monthly basis holding all
> corporate monies till [sic] the following month to be able to pay all expenses.  I
> will then see what is left over and use a special calculation [to determine salary].

(Ex. NWI-N at NWIMK01833).

[26]      At trial, when asked why he made the decision to draw down NWI's credit lines so
substantially, Bell responded, "I can't tell you."  (2 N.T. 4:12:16).

1:36:45).

77. Bell was suspended from his duties as Executive Director, pending the outcome of the

investigation.  (1 N.T. 10:45:05).

78. On July 26, 2006, NWI terminated Bell's employment as Executive Director for cause.

(Ex. NWI-I; 1 N.T. 10:47:30).


**Bell's Scienter**

79.   To the extent that Bell caused NWI to pay him compensation in excess of the Employment

Agreement and otherwise took funds from NWI for this own benefit without authorization,

he did so with a fraudulent intent.  See Part V.B, infra.


## IV.  LEGAL STANDARDS

### A.  Dischargeability Generally

One of the Bankruptcy Code's central purposes is to permit honest debtors to reorder

their financial affairs and obtain a "fresh start," unburdened by the weight of preexisting debt.

See In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995); In re Marques, 358 B.R. 188, 193 (Bankr.

E.D. Pa. 2006).  Exceptions to discharge are construed strictly against creditors and liberally in

favor of debtors.  Cohn, 54 F.3d at 1113; In re Glunk, 455 B.R. 399, 415 (Bankr. E.D. Pa. 2011).

A creditor objecting to the dischargeability of an indebtedness bears the burden of proof.

Cohn, 54 F.3d at 1113; In re Kates, 485 B.R. 86, 100 (Bankr. E.D. Pa. 2012).  The creditor must

establish the elements under §523(a) by a preponderance of the evidence.  Grogan v. Garner, 498

U.S. 279, 291 (1991); Kates, 485 B.R. at 100 (citations omitted).

## B.  11 U.S.C. §523(a)(4)

Section 523(a)(4) provides: "A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt – for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. §523(a)(4).

Section 523(a)(4) is divided into three (3) parts.  The first part is the "fiduciary prong" and it requires the creditor to establish that the debtor (1) was in a fiduciary relationship with the creditor, and (2) committed fraud or defalcation within the scope of that fiduciary relationship.  See, e.g., In re Roemmele, 2011 WL 4804833, at *4 (Bankr. E.D. Pa. Oct. 11, 2011) (citing cases).  The second and third parts do not require proof of an existing fiduciary relationship, but rather, proof that the debtor committed embezzlement or larceny, as those terms are defined by federal common law.  Id. at *5; In re Burke, 416 B.R. 136, 145 (Bankr. E.D. Pa. 2009).

I do not understand NWI to assert any nondischargeability claims under the fiduciary prong of §523(a)(4).[27]  Its §523(a)(4) claim is for embezzlement.[28]

"To prove a debtor committed embezzlement within the meaning of §523(a)(4), a

---

[27]   There is no discussion of fiduciary duties in the Plaintiff's initial post-trial memorandum and only a passing reference to the fiduciary duties of an officer or shareholder of a closely held corporation in the Plaintiff's reply memorandum, and even that reference addresses only Indiana law, not §523(a)(4) of the Bankruptcy Code.  See generally In re Coley, 433 B.R. 476, 495 (Bankr. E.D. Pa. 2010) (determination whether a debtor was acting in a fiduciary capacity is a question of federal law and, although the bankruptcy court will look to state law for guidance, the bankruptcy term does not encompass every relationship that is considered "fiduciary" in nature under state law; rather the federal term is limited to formal trust agreements and trust-type obligations imposed by statute or common law).  As a result, I read the reply brief as pointing out only that Bell's ability to commit an embezzlement was facilitated by the nature of his relationship to NWI.

[28]   Here, I have determined that the debts are nondischargeable based on embezzlement.  Therefore, it is unnecessary to discuss the statutory requirements for nondischargeability under the fiduciary prong of §523(a)(4), the larceny prong of §523(a)(4) or under §523(a)(6).

plaintiff must establish that: (1) the debtor was entrusted; (2) with property; (3) of another; (4)

which the debtor misappropriated for his own use; and (5) with fraudulent intent." In re Tyson,

450 B.R. 514, 522-23 (Bankr. E.D. Pa. 2011); Burke, 416 B.R. at 145 (quoting In re House, 2007

WL 2126260, at *4 (Bankr. N.D. Ill. 2007)).


# V.  DISCUSSION

## A.  Categories of Unauthorized Payments

NWI asserts that Bell embezzled funds from the company through his receipt of:

> (1)  excess Base Salary;

> (2)  excess Bonus payments;

> (3)  unauthorized corporate dividends;

> (4)  excess retirement plan contributions;

> (5)  unauthorized payments for alleged business and personal expenses;

Each of these categories is discussed separately below.


### 1. excess Base Salary

From 1996 to 1998, Bell's employment agreements with Ortho, Inc. provided that Bell

would received a Base Salary of $80,000.00.  During this time period, Bell was not entitled to a

Bonus or dividends.

Once he renegotiated his Employment Agreement in 1999, Bell was then eligible for a

Bonus based on the earnings of the Doctors.  However, his Base Salary was $80,000.00 and Bell

was guaranteed at least the Base Salary regardless of how much the Doctors were being

compensated.  Therefore, from 1996 through 2006, Bell's Base Salary was a static amount:

$80,000.00 annually.  The following table illustrates the overpayments to the Debtor of Base

Salary for each year.[29]

| Year | Base Salary | Salary Received | Excess |
|---|---|---|---|
| 1996 | $80,000.00 | $13,334.34 | $0.00 |
| 1997 | $80,000.00 | $80,000.00 | $0.00 |
| 1998 | $80,000.00 | $102,288.94 | $22,288.94 |
| 1999 | $80,000.00 | $116,666.58 | $36,666.58 |
| 2000 | $80,000.00 | $94,166.58 | $14,166.58 |
| 2001 | $80,000.00 | $87,166.58 | $7,166.58 |
| 2002 | $80,000.00 | $97,416.10 | $17,416.10 |
| 2003 | $80,000.00 | $69,999.93 | ($10,000.07) |
| 2004 | $80,000.00 | $88,839.34 | $8,839.34 |
| 2005 | $80,000.00 | $86,275.44 | $6,275.44 |
| 2006 | $40,000.00 | $55,384.56 | $15,384.56[30] |
| **Total** | | | **$118,204.06** |

---

[29]     Ex. NWI-T includes a salary recap, which consists of both the Base Salary and Bonus that Bell received.  Although I have relied on Ex. NWI-T in formulating the chart set out above in the text, I have subtracted the Bonus amounts that were included in the exhibit.

[30]     In 2006, Bell was employed for approximately half of the year.  He was suspended in June or July 2006 and formally terminated on July 26, 2006.

-23-

## 2. excess Bonus

Commencing in 1999, Bell was entitled to his Base Salary plus a Bonus that was calculated in relation to the Doctors' salaries, bonuses, and dividends.  In 2003, not long after NWI acquired Ortho, Inc., Bell alerted the Doctors that NWI was encountering a liquidity crisis and financial downturn.  Bell now claims that the financial crisis was the result of retiring doctors' payouts, competition from other orthodontic practices, and uncontrolled business expenses.

In the second half of 2003, Bell ceased paying the Doctors' salaries, but periodically made corporate distributions to the Doctors.  Nevertheless, in 2003 Bell paid himself a Bonus of over $70,0000.00.[31]  His 2003 Bonus does not appear to correlate in any manner to the amounts that the Doctors were paid in 2003.  Based on the Doctors' salaries, bonuses, and dividends for that year, the Debtor would not have been entitled to any Bonus.

The chart below, derived from NWI's expert's report, summarizes the Bonus overpayments:

| Year | Bonus | Bonus Received | Excess |
|------|-------|----------------|--------|
| 1999 | $31,686.69 | $104,407.08 | $72,720.19 |
| 2000 | $22,058.79 | $102,578.74 | $80,519.95 |
| 2001 | $14,195.64 | $47,005.44 | $32,809.80 |
| 2002 | $46,391.24 | $94,788.81 | $48,397.57 |
| 2003 | $0.00 | $70,499.79 | $70,499.79 |

---

[31]     Incredibly, in 2003, Bell authorized and received Salary, Bonus, and Dividends in excess of $250,000.00, while the other shareholders were forgoing salary and bonuses in the second half of the year.  (See Exs. NWI-T, NWI-V, NWI-BB).

-24-

| 2004 | $0.00 | $30,242.28 | $30,242.28 |
|------|-------|------------|------------|
| 2005 | $0.00 | $33,545.10 | $33,545.10 |
| 2006 | $3,862.63 | $28,167.32 | $24,304.69 |
| **Total** | | | **$393,039.37** |

### 3.  corporate dividends

NWI asserts that Bell received $162,342.00 in dividends from 2003-2005 and that Bell was not entitled to receive dividends because he was not an owner of NWI.

In response, Bell points out that he was a shareholder of the corporation and, as such, was entitled to the same distributions made to the other shareholders.  However, Bell admits that he never told the Doctors that he was paid his regular salary plus dividends while the Doctors were receiving dividends in lieu of salary.  He nevertheless claimed that the Doctors knew he was receiving dividends.

In evaluating the propriety of Bell's receipt of corporate distributions, the threshold question is whether Bell was entitled to receive them.  The Employment Agreement did not provide for dividends to Bell.  This is not surprising because Bell was not a shareholder at the time the parties negotiated and entered into any of his employment agreements.

The Shareholder Agreement also did not address the subject.  Bell suggests that once he became a shareholder in 2003, he was entitled to dividends equal to the other shareholders.   And yet, while the Shareholder Agreement (Ex. NWI-W) ostensibly made Bell an equal shareholder, it withheld from him certain shareholder rights.  For example, paragraph 17 specifically excluded Bell from all ownership interests upon his exit from the corporation.  Thus, the key question here

-25-

is: in the absence of an express contractual provision, did the parties' intend to exclude Bell from

receiving dividends when they entered into the Shareholder Agreement?   I conclude that they did

so intend.

**a.**

Under Pennsylvania contract law,[32] it is axiomatic that "the intent of the parties to a

written contract is contained in the writing itself."  Bohler-Uddeholm Am., Inc. v. Ellwood Group,

Inc., 247 F.3d 79, 92 (3d Cir. 2001) (citation omitted).  Thus, when a party seeks to supplement or

_____

[32]      The Shareholder Agreement did not specify which state's law would govern the
interpretation of the contract.  Generally, "[t]o answer a choice-of-law issue, federal courts are required
to apply the choice-of-law rules of the "state in which it sits."  In re Dombrowski, 478 B.R. 198, 203
(Bankr. M.D. Pa. 2012) (quoting In re Buffalo Molded Plastics, Inc., 354 B.R. 731, 750 (Bankr. W.D. Pa.
2006)); see also Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).

      Pennsylvania choice of law analysis has two parts: "First, the court must look to see
whether a false conflict exists. Then, if there is no false conflict, the court determines which state has the
greater interest in the application of its law."  LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir.
1996).  Where the application of the law of two jurisdictions does not produce different results on an
issue, then there is no actual conflict, i.e., it is a false conflict.  Berg Chilling Sys. v. Hull Corp., 435 F.3d
455, 462 (3d Cir. 2006).  In the case of a false conflict, the court should avoid deciding the conflict of
laws issue.  Id.  In those instances, courts apply the law of the forum state.  State Farm Fire & Cas. Co. v.
Holmes Products, 165 F. App'x 182, 185 n.1 (3d Cir. 2006) (nonprecedential); Financial Software
Systems, Inc. v. First Union Nat. Bank, 1999 WL 1241088, *3 (E.D. Pa. Dec. 16, 1999).

      Here, both Indiana and Pennsylvania follow the Restatement (Second) of Contracts on
integration of contracts and the parol evidence rule.  Compare Monon Corp. v. Wabash Nat'l Corp., 780
F. Supp. 577 (N.D. Ind. 1991) (partially integrated contract may be supplemented by consistent terms
(citing Restatement (Second) of Contracts §215)), and Franklin v. White, 493 N.E.2d 161 (Ind. 1986)
(parol evidence may be admitted to supply an omission in terms), with Claret Capital Nominees v. John
Benett, 2010 WL 300288, *3 (E.D. Pa 2010) (party can seek to add term to contract if party alleges that
an agreed-upon term was omitted from final written contract), and Yocca v. Pittsburgh Steelers Sports,
Inc., 854 A.2d 425, 436 (Pa. 2004) (parol evidence may be introduced to vary writing meant to be
parties' entire contract where term was omitted).

      Application of either Indiana or Pennsylvania contract interpretation rules lead to the
same outcome.  Consequently, consistent with the "false conflict" doctrine, I will apply Pennsylvania
law.

vary the terms of a written contract, the parol evidence rule is potentially implicated.  Claret
Capital Nominees v. John Benett, 2010 WL 300288, *3 (E.D. Pa 2010).

"The parol evidence rule 'prohibits the admission of extrinsic evidence of prior or
contemporaneous oral agreements, or prior written agreements, to explain the meaning of a
contract when the parties have reduced their agreement to an unambiguous integrated writing.'"
Prior v. Innovative Communs. Corp, 207 Fed. Appx. 158 (3d Cir. 2006) (non-precedential)
(citing Richard A. Lord, Williston on Contracts, §33 (4th ed. 1999)).  In order to determine
whether the parol evidence bars the admission of evidence, the court must first determine whether
the contract is fully integrated.  Claret Capital Nominees v. John Benett, 2010 WL 300288, *3
(E.D. Pa 2010); Restatement (Second) of Contracts §209(2) (whether a contract is fully integrated
is "a question preliminary to determination of a question of interpretation or to application of the
parol evidence rule").

A written contract is integrated if it represents a final and complete expression of the
parties agreement.  Kehr Packages v. Fidelity Bank, N.A., 710 A.2d 1169, 1173 (Pa. Super. Ct.
1998) (citing Lenzi v. Hahnemann University, 664 A.2d 1375, 1379 (Pa. Super. 1995)).  A
contract is partially integrated 'if the writing omits a consistent additional agreed term which  . . .
in the circumstances might naturally be omitted from the writing.'"  Id.  The issue of whether the
contract is integrated is a question of law.  Lenzi v. Hanemann Univ., 664 A.2d. 1375, 1379 (Pa.
Super. Ct. 1995).

In determining whether the contract is fully or partially integrated, courts consider whether

the contact contains a merger or integration clause,[33] the length and detail of the contract, the

formality of the setting, and whether the contract is a form.  See 6 Corbin on Contacts §25.7

(LexisNexis 2011).  Courts may also consider extrinsic evidence in this inquiry, i.e., prior

negotiations or agreements of the parties, whether oral or written, that were made regarding the

contract.  Restatement (Second) of Contracts §214(a) (1981); Rempel v. Nationwide Life Ins. Co.,

Inc., 370 A.2d 366, 371 (Pa. 1977) ("parol evidence rule is no bar to oral testimony designed to

show that the writing is not an integrated writing"); accord Kohn v. Kohn, 364 A.2d 350, 353-54

(Pa. Super. Ct. 1976); see also Restatement (Second) of Contracts  §210 cmt. b. ("a writing cannot

of itself prove its own completeness, and wide latitude must be allowed for inquiry into

circumstances bearing on the intention of the parties").

After establishing that a contract is not fully integrated, the court may then consider

extrinsic or parol evidence on the issue whether the parties intended to include other terms in

agreement.

**b.**

The Shareholder Agreement did not contain a merger or integration clause within the four

(4) corners of the document itself.  While probative of the parties intent, the absence of such a

written clause is not conclusive on the issue of integration.  See Kehr Packages, 710 A.2d at 1173

(in absence of merger clause, court must examine text of  agreement to determine completeness);

cf. Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004) (presence of

---

[33]     Kehr Packages, 710 A.2d at 1173 ("[I]n the absence of an integration clause, the court
'must examine the text [of the agreement] to determine its completeness.'" (quoting Henry v. First Fed.
Sav. & Loan Assoc., 313 Pa. Super. Ct. 459 A.2d 772, 776 (Pa. Super. Ct. 1983))).

integration clause is clear sign that writing is meant to express all prior negotiations, conversations, and agreements of contracting parties).

The extrinsic evidence in the record regarding the negotiation and drafting of the Shareholder Agreement was meager, but nonetheless sufficient to support the conclusion that the it was not fully integrated.

The Doctors relied on Bell and the corporation's professionals to draft and execute the necessary documents to effect the tax status conversion of the orthodontic practice. Bell was the NWI representative handling the conversion and the Shareholder Agreement was drafted by NWI's corporate counsel, Jorgensen. It was not an arms-length transaction with separate counsel involved on behalf of the individual shareholders. Rather, the circumstances indicate the conversion was handled in an informal manner. In that setting, it is understandable that certain aspects of the agreement would not have been put in writing.

This conclusion is reinforced by the rationale Bell offered for requesting that he be elevated to shareholder status in the new entity created for the corporate conversion from subchapter S to subchapter C.

Bell explained that shareholder status provided a means for him to share in the tax benefits available to NWI shareholders upon subchapter S election – his participation in this tax benefit being in the nature of a discreet reward for his efforts in bringing the benefit to the Doctors. (1 N.T. 11:42:00, 1:20:20).

From this context, I draw certain inferences regarding the parties' intent in entering into the Shareholder Agreement. Most importantly, I find that the **sole** purpose in making Bell a shareholder was to provide him with the expected tax benefits and that his ownership interest in

NWI (going forward) was to be nominal only.  This intention finds expression in paragraph 17 of the Shareholder Agreement, which eliminated any payout to Bell (in contrast to the Doctors) upon his withdrawal from NWI.  Accordingly, it follows that given the parties' intention to limit Bell's shareholder status, there was no intention for him to receive pro rata shareholder distributions on par with the Doctors.

I recognize that a negative inference might be drawn from the fact that Paragraph 17 of the Shareholder Agreement expressly denies Bell the financial benefits other shareholders receive upon withdrawal from the business while the Agreement is silent on the question of distributions to shareholders.  However, I draw a stronger inference from the parties' failure to amend the Employment Agreement.  Had the parties intended to provide Bell with equal dividend rights, I consider it more likely than not that they would have revised the Employment Agreement to address such a material modification of his compensation package.[34]

For these reasons, I conclude that the Shareholder Agreement was partially integrated and supplemented by an oral agreement that Bell would be a shareholder in name in order to obtain the tax benefits derived from NWI's subchapter S election .  The parties did not intend for Bell to share in any other financial benefits of shareholder status, such as the right to receive dividends.  Thus, NWI established that Bell was not entitled to corporate dividends under the parties' agreement.

---

[34]      Indeed, if the Employment Agreement and the Shareholder Agreement were construed as urged by Bell, he would be not only entitled to pro rata corporate dividends, but the issuance of such dividends would also have boosted his Bonus.  I consider it highly unlikely the Doctors would have agreed to what would almost amount to "double-dipping."

#### 4. excess retirement plan contributions

Bell does not dispute that he received $35,238.00 in excess contributions to his retirement account.  Considering that the excess contributions were calculated as a function of Bell's compensation, the excess contributions constitute merely another form of excessive compensation.

#### 5. business and personal expenses

NWI itemized several categories of expenses, both business and personal, for which it claims Bell is liable.  These categories of debt include:

| | |
|---|---|
| Unsubstantiated corporate credit card/personal expenses | $236,541.00[35] |
| Unauthorized corporate checks made out to Bell | $162,744.00[36] |
| Mileage Reimbursement | $ 31,244.00 |
| Personal tax obligation paid by NWI | $ 35,228.00 |
| Petty Cash Distributions | $ 56,375.00 |

I have grouped these remaining items of indebtedness together because they all were types of draws on the corporate account that clearly Bell was unauthorized to make.

Bell denied that the expert report was correct, but came forward with no evidence to refute the figures that the expert opined were unauthorized or excessive.

Similarly, Bell had no authority to use $35,228.00 in corporate funds to pay his individual

---

[35]    This is the amount of credit card charges I have found to be unauthorized, not the amount originally claimed by NWI.  See Findings of Fact Nos. 43-46.

[36]    One component of this sum is the $65,000.00 unauthorized check that Bell took on August 14, 2003.  See Finding of Fact No. 70.  The balance is derived from three sources: (1) $11,479.00 in voided checks that nonetheless cleared to Bell's benefit; (2) $66,976.00 in other checks Bell drew; and (3) $19,289.00 in personal advances Bell drew.  (See Ex. NWI-BB, at 4 (unpaginated).

tax obligation as a result of the 2006 IRS audit, or to pay himself $31,244.00 for business mileage expenses after May 2003.

Lastly, I have resolved the factual dispute regarding the petty cash disbursements and found that Bell had no authority or business justification for making those payments in the amount of $56,375.00.  See Findings of Fact Nos. 52-57.


### B.  Bell's Scienter

To establish that the Debtor "embezzled," within the meaning of §523(a)(4), the corporate funds discussed above, NWI must show that: (1) the debtor was entrusted; (2) with property; (3) of another; (4) which the debtor misappropriated for his own use; and (5) with fraudulent intent.

Based on the findings of fact in Part III, as further explained in Part V.A, there is no doubt that the first four (4) elements have been satisfied.  As discussed above, Bell had substantial responsibility in managing and controlling the corporate books, operating accounts, payroll accounts, retirement plans, capital expenditures, and business expenses.  Bell lawfully come into control of NWI's assets and lines of credit.  There is no question that Bell had authority to carry out most of the financial operations of the corporation and that he misappropriated substantial sums.

This leaves only the question of Bell's intent.  Simply put, the unauthorized withdrawal of corporate funds for compensation by an officer of a corporation, committed with fraudulent intent, is embezzlement.  In re Lane, 445 B.R. 555, 565-66 (Bankr. E.D. Va. 2011); In re Phillips, 185 B.R. 121, 129 (Bankr. E.D.N.Y. 1995); In re Johann, 125 B.R. 679, 681-82 (Bankr. M.D. Fla. 1991).

It is the rare case in which a party will admit to fraudulent intent. Thus, it is well settled that a plaintiff may prove fraudulent intent by circumstantial evidence and consideration of the totality of the circumstances.  See, e.g., In re Cohn, 54 F.3d 1108, 1118-19 (3d Cir. 1995); In re Giquinto, 388 B.R. 152, 166-67 (Bankr. E.D. Pa. 2008).  In particular, fraudulent intent may be inferred from a course of conduct such as a "pattern of concealment and nondisclosure." Cadle Co. v. Zofko, 380 B.R. 375, 383 (W.D. Pa. 2007 ) (quoting In re Dolata, 306 B.R. 97, 149 (Bankr. W.D. Pa. 2004)).

In this case, I find sufficient indicia in the record to support the inference that Bell acted with fraudulent intent in misappropriating NWI assets.

For example, Bell did not contest that he received the overpayments of base salary described in Part V.A.1. and offered no justification for the overpayments.  The absence of any explanation supports the inference that Bell knew, when he drew the money for his own benefit, that it was improper to do so and therefore, did so with fraudulent intent.  The same holds true with respect to the Bonus overpayments described in Part V.A.2.  Besides his self-serving, conclusory and ultimately unconvincing testimony that he believed that he was compensating himself correctly under the terms of the Employment Agreement, Bell did not provide any business justification or explanation whatsoever for the Bonus overpayments.

With respect to the corporate distributions, see Part V.A.3, Bell caused NWI to pay him corporate dividends, knowing full well that his shareholder status was granted solely to provide him with a one time tax benefit.  Further, he misrepresented NWI's financial status to the Doctors and reduced their compensation, while secretly drawing substantial sums in compensation for himself.  See Findings of Fact Nos. 66-75.

In short, a sufficient pattern of deception exists in this case as to warrant the inference that

Bell acted with fraudulent intent.  As a result, I conclude that Bell deliberately withdrew corporate

funds as dividends for his own personal use which he knew were unauthorized under the terms of

his Employment Agreement and otherwise.  This taking constituted an embezzlement under

§523(a)(4).


### C.  The 1998 Note

I separately address NWI's claim regarding the 1998 Note because it did not involve an

embezzlement.  Rather, NWI asserts that the $80,000.00 debt arising from Bell's failure to repay

the 1998 Note is nondischargeable because Bell fraudulently induced NWI to grant the loan

without any intention of paying it back.  NWI, however, did not plead a §523(a)(2) claim and did

not seek to amend its Complaint to add a §523(a)(2) count.[37]

Further, even if I were to treat the claim as "tried by consent," see Fed. R. Civ. P. 15(b)(2),

the claim fails.

NWI admits that the 1998 loan to Bell was authorized by the Doctors and properly

---

[37]      11 U.S.C. §523(a)(2)(A) provides:

(a)      A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title
does not discharge an individual debtor from any debt—
             .  .  .

(2)      for money, property, services, or an extension, renewal, or refinancing of
credit, to the extent obtained, by—

(A)      false pretenses, a false representation, or actual fraud, other than
a statement respecting the debtor's or an insider's financial
condition; . . .

-34-

documented.  Thus, unlike other instances in which Bell caused obtained funds from NWI without authority and (sometimes) surreptitiously, this loan transaction was <u>bona fide</u> on its face.  As a result, to prevail, NWI has to establish more than the mere fact that Bell failed to repay the loan. NWI must prove that, at the time Bell entered into the transaction, he had no intention of repaying the obligation.  <u>See, e.g.</u>, <u>August</u>, 448 B.R. at 350; <u>Giquinto</u>, 388 B.R. at 166.

There is no direct evidence that, at the inception of the parties' relationship, Bell had a fraudulent or malicious intent which could support a finding that the loan is excepted from discharge under §§523(a)(4) or (6).  While I recognize that Bell's subsequent conduct might support a finding that his earlier conduct, including his receipt of the 1998 loan, was motivated by a fraudulent intent, I do not draw that inference.  Given his status in 1998 as a new employee, I consider it more likely that Bell took the loan in good faith, developing his fraudulent intent only later, after he solidified his position and built up the Doctors' confidence in his management skills.

### D.  Treble Damages and the Entry of a Money Judgment

NWI requests that the bankruptcy court award it treble damages on account of the nondischargeable debt and enter a money judgment in its favor.  In the exercise of my discretion, I decline to do either.

To the extent that exemplary damages are awarded in connection with a nondischargeable debt, such damages, too, are nondischargeable.  <u>Cohen v. de la Cruz</u>, 523 U.S. 213, 219-21 (1998).  However, the question whether the amount of a nondischargeable debt should be liquidated and reduced to judgment by the bankruptcy court is left to the court's discretion.  <u>See,</u>

e.g., In re Bath, 442 377, 398-99 (Bankr. E.D. Pa. 2010); In re Chan, 2008 WL 5428271, at *21-22 (Bankr. E.D. Pa. Dec. 31, 2008).

NWI proposes to supplement the record to provide further evidence regarding damages components that it contends are subject to being trebled under Indiana law.[38]  Thus, in no event is it possible to enter a final, fully liquidated judgment at this time.  In these circumstances, with all of the nondischargeability issues resolved, I consider it preferable to conclude the litigation in this court and permit NWI to complete the liquidation of its claim in state court.

The exercise of my discretion in this manner also is influenced, to some extent, by quasi-jurisdictional concerns.  NWI assumes that the bankruptcy court has the authority to enter a money judgment in connection with a nondischargeability adversary proceeding.  Most, but not all, courts that have considered the issue agree with NWI.  See, e.g., In re Morrison, 555 F.3d 474, 478 (5th Cir. 2009) (citing courts of appeal decisions from the 2nd, 6th, 7th, 8th and 9th Circuits). Contra In re Thrall, 196 B.R. 959, 968-73 (Bankr. D. Colo. 1996).  Of course, all of these decisions pre-date Stern v. Marshall, 131 S. Ct. 2594 (2011), which held that a (non-Article III) bankruptcy court may not enter a final judgment on a non-bankruptcy, common law claim unless the claim involved a "public right" or the final resolution of the claim was an essential part of the claims allowance process.  Id. at 2611-12, 2617-18.

In this case, NWI's claims against Bell are common law claims.  Certainly, a determination of the validity of those claims is necessary in the exercise of the core bankruptcy court function of determining the dischargeability of the underlying debt.  See August, 448 B.R. at

---

[38]        These include counsel fees, costs and travel expenses.

346-347 (for a debt to be nondischargeable, valid claim must exist).  However, it is not obvious to

me that the entry of a money judgment as part of the process is a "necessary" part of the

nondischargeability determination process as contemplated in <u>Stern</u>, as opposed to an action

rooted in notions of  judicial "economy."  Thus, in the absence of consent, I am reluctant to enter

a judgment.  Conceivably, I could make proposed findings of fact and conclusions of law as the

foundation for the possible entry of judgment by the district court.  However, rather than involve a

third court in the resolution of this matter, I consider it preferable that NWI return to state court,

where the litigation between the parties originated.


## VI.  CONCLUSION

For the reasons set for above, NWI has met its evidentiary burden of proving that its claim

in the amount of $1,230,956.43.[39] and for treble damages (to the extent awarded in the discretion

of the state court) are nondischargeable under 11 U.S.C. §523(a)(4).

An appropriate order will be entered.

---

[39]     This figure consists of:

| | |
|---|---|
| Excess Salary | $118,204.06 |
| Excess Bonus | $393,039.37 |
| Corporate Dividends | $162,342.00 |
| Unsubstantiated corporate credit card/personal expenses | $236,541.00 |
| Mileage Reimbursement | $ 31,244.00 |
| Petty Cash Distributions | $ 56,375.00 |
| Excess Retirement Contributions | $ 35,239.00 |
| Personal tax obligation paid by NWI | $ 35,228.00 |
| Other unauthorized corporate checks made out to Bell | $162,744.00 |
| **Total** | **$1,230,956.43** |

Date: **September 18, 2013**

**ERIC L. FRANK**
**CHIEF U.S. BANKRUPTCY JUDGE**